**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

HOLLISTER INCORPORATED,
an Illinois corporation,

     Plaintiff,

     v.

BRENDAN SUGRUE,

     Defendant.

**Jury Trial Demanded on All Counts**

## COMPLAINT

Plaintiff, Hollister Incorporated ("Hollister"), by and through its undersigned counsel, hereby brings the following Complaint against Defendant, Brendan Sugrue ("Sugrue"), its former Vice President Manufacturing Strategy, seeking injunctive relief and monetary damages, based on his: (1) misappropriation of trade secrets in violation of the federal Defend Trade Secrets Act of 2016, 18 U.S.C. §§ 1836, *et seq.*; (2) misappropriation of trade secrets in violation of the Illinois Trade Secrets Act, 765 ILCS 1065/1 *et seq.*; and (3) having exceeded his authorized access to Hollister's computers in violation of the federal Computer Fraud and Abuse Act, 18 U.S.C. §§ 1030, *et seq.*

## NATURE OF THE CASE

After learning his employment was coming to an end, Sugrue secretly began exfiltrating substantial amounts of Hollister's trade secrets and other proprietary information from Hollister's computing environment by downloading information to personal and/or externally-owned electronic devices and emailing information to his personal email account – blatant violations of his 2022 Employment Agreement, Hollister's Global Acceptable Use of Computing Assets Policy,

Hollister's Code of Conduct, and the Voluntary Separation Agreement Hollister tendered to him for review several weeks before his March 31, 2023 last date of employment and which he ultimately signed. Sugrue subsequently attempted to cover up his wrongdoing, including by deleting materials from Hollister's computing assets and wiping his personal devices, even after Hollister's Chief Human Resource Officer told him not to delete Hollister information from Hollister computing assets or Sugrue's personal devices and demanded he turn over his personal devices to Hollister for forensic review. Further telling of Sugrue's misconduct is his repeated refusal to represent and warrant to Hollister that he did not transfer Hollister's information to a third party other than the vendor(s) he used to improperly wipe his personal devices. Sugrue's misconduct constitutes misappropriation of trade secrets in violation of the Defend Trade Secrets Act and the Illinois Trade Secrets Act, and unauthorized access to Hollister's computers in violation of the federal Computer Fraud and Abuse Act.

## PARTIES

1.     Plaintiff Hollister is an Illinois corporation with its principal place of business in Libertyville, Lake County, Illinois.

2.     Upon information and belief, Defendant Sugrue is a resident of Illinois and lives in Lake Bluff, Illinois.

## JURISDICTION AND VENUE

3.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1331 because Hollister's claims are brought under federal statutes - the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. §§ 1836, *et seq.*, and the Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. §§ 1030, *et seq*. This Court has supplemental jurisdiction over the Illinois Trade Secrets Act claim pursuant to 28 U.S.C. § 1367(a) because that claim is so related to claims in the action

within original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution. Venue is appropriate pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to the claims alleged herein occurred in this judicial district and because Sugrue, on information and belief, is a resident of Illinois.

## STATEMENT OF FACTS

### HOLLISTER'S BUSINESS AND TRADE SECRETS

4.      Hollister is an independently-owned global company that develops, manufactures, and/or markets health care products, including ostomy,  continence, critical care (including bowel management), and wound care products.

5.      In order for certain of its employees to perform their jobs, Hollister provides them with access to trade secret and other confidential information.  This trade secret and other confidential information includes, but is not limited to, the manufacturing process for its ostomy, continence, critical care, and wound care products; strategic planning for these products; strategic vision and direction of the Hollister organization as a whole; financing and marketing decisions; financial information; challenges faced by Hollister's products in both use and competition; and steps (and evaluation of those steps) Hollister has implemented and is considering implementing to address those challenges.

6.      Due to the extremely competitive nature of the health care products industry, Hollister takes extensive measures to protect its trade secrets and other confidential information by, among other things, prohibiting employees from accessing business applications or networks with their personal or externally-owned devices unless access has been granted by Hollister's Information Technology Department, requiring password protection of all computers and mobile devices, enhanced protection for trade secrets, requiring a keycard to access its physical sites and

buildings; password-protecting and encrypting its computers, email accounts, and information systems; creating firewalls; limiting access (electronically and physically) to sensitive information to those employees whose positions warrant them having such access; and clearly communicating to employees that Hollister's trade secret and other confidential information is to be kept confidential.

7.     Hollister takes other measures to protect its trade secret and other confidential information, as well.  For example, Hollister has a "clean desk" policy and guidelines on securing its highly sensitive competitive and confidential information in locked areas.  Management regularly performs reviews to ensure compliance with these policies. Sugrue was subject to these requirements.

## SUGRUE'S HISTORY, AND AGREEMENTS, WITH HOLLISTER

8.     Hollister hired Sugrue as a Manager Manufacturing in Ireland in 2000. Hollister relocated Sugrue to Libertyville, Illinois as its Director of Global Operations in August 2013. Hollister promoted Sugrue to Vice President of Global Manufacturing in 2014.  Hollister promoted Sugrue to Vice President of Global Operations and made him a corporate officer in 2016.  Sugrue gained access to Hollister's trade secrets and other confidential information because of these positions.

9.     Due to his responsibilities, Hollister issued Sugrue a Lenovo laptop computer, owned by Hollister, with access to Hollister's secure computing environment, including confidential and proprietary processes and information. At the outset of his employment, and, as a condition of employment, Sugrue signed a confidential information agreement.

10.     Hollister demoted Sugrue to Vice President Manufacturing Strategy, a non-officer position, effective August 1, 2022. Hollister presented Sugrue with an Employment Agreement setting forth the terms and conditions of that employment (the "2022 Employment Agreement").

11.     In consideration of his employment with Hollister as Vice President Manufacturing Strategy, Sugrue signed the 2022 Employment Agreement.  A true and correct copy of the 2022 Employment Agreement is identified as **Exhibit A** and made a part hereof.  Exhibit A will be filed under seal for confidentiality reasons. His consideration included continuing to pay him the base salary he enjoyed in his former positions as Vice President of Global Operations and a corporate officer, offering him a lucrative separation package if Hollister terminated him without cause prior to July 31, 2025 -- subject to his compliance with certain conditions, including his execution of, and compliance with, the 2022 Employment Agreement and a Voluntary Separation Agreement and General Release of Claims ("VSA") in a form satisfactory to Hollister – and providing continued access to Hollister's trade secrets and other confidential information, Sugrue signed the 2022 Employment Agreement.

12.     In the 2022 Employment Agreement, Sugrue expressly agreed he owed a duty of loyalty to Hollister, stating, "[d]uring [his] employment with Hollister, [he] shall fully comply with anything needed to fulfill [his] duty of loyalty to Hollister, which includes … (e) remaining in compliance with any and all laws, policies, rules, and procedures applicable to [his] positions with Hollister, (f) complying with Hollister's Code of Conduct."  (Ex. A, § 6.)

13.     The 2022 Employment Agreement also addresses Sugrue's obligations not to improperly use or disclose the trade secret and other confidential information of Hollister, its parent company, The Firm of John Dickinson Schneider, Inc. ("JDS"), and of JDS' subsidiary, KMT Medical Incorporated ("KMT"), and these entities' affiliates and assigns.  Specifically,

Sugrue is restricted under the terms of the 2022 Employment Agreement from using or disclosing any confidential or trade secret information, except as required in the course of his authorized duties for Hollister. (Ex. A, §§ 7.1, 7.5.)

14. The 2022 Employment Agreement also addresses Sugrue's obligations to return to Hollister the trade secret and other confidential information of Hollister, JDS, and KMT. Specifically, Sugrue is required to return to Hollister "all whole and partial copies and derivatives of Proprietary Information, as well as all other property of Hollister and its Affiliates, whether in [his] possession or under [his] direct or indirect control." (Ex. A, § 7.2.)

15. Sugrue also agreed he "shall promptly notify [his] supervisor, a Human Resources manager, or a member of the Law Department or the Compliance Team of Hollister if [he] learn[s] of any possible unauthorized use or disclosure of Proprietary Information and shall cooperate fully with Hollister Group to enforce its rights in such information." (Ex. A, § 7.5.)

16. Sugrue also agreed, pursuant to Hollister's Global Records Management Policy, that if he has "Business Records or Recorded Information in [his] custody [he] must immediately return that material to Hollister upon request or when ending [his] employment with or services for Hollister" (§ IV.A.) A true and correct copy of Hollister's Global Records Management Policy is attached as **Exhibit B** and made a part hereof.

17. Sugrue also agreed, pursuant to Hollister's Global Confidential Information and Data Protection Policy, that (a) his "viewing, accessing, or disclosing … confidential information outside the scope of [his] assigned responsibilities or to unauthorized parties (including other Associates) or to any person who is authorized, but who does not have a legitimate business need, to view, access, or receive such … confidential information" is an event he must report to Hollister's Chief Data Protection Counsel ("CDPC") (§ III.); (b) he would not share with, or allow

the processing of Hollister's confidential information by, third parties ((§ IV.E.); (c) he is required to assist Hollister and the CDPC in any investigation of a Data Security Incident (§ IV.F.); and (d) upon termination from Hollister, he must deliver all confidential information in his possession and/or under his control to his supervisor (§ IV.H.).  A true and correct copy of Hollister's Global Confidential Information and Data Protection Policy is attached as **Exhibit C** and made a part hereof.

18.     Sugrue also agreed, pursuant to Hollister's Global Acceptable Use of Computing Assets Policy, that he (a) would not use Hollister technology resources, including Hollister's computing network and his Hollister-assigned laptop and mobile devices ("Computing Assets") for personal use save for incidental personal use, and would not store personal information on Hollister's Computing Assets except in limited amounts (§§ III; IV.A.); (b) would not use Computing Devices or Electronic Data for any illegal, infringing, offensive, or harmful purpose (§ IV.B.1.); (c) *would not access Hollister business applications or networks with his personal or externally-owned devices, unless access has been granted by the Hollister Information Technology Department* (§ IV.B.2.); (d) *would not store Hollister's electronic business data in networks outside of Hollister* (§ IV.B.3.); and (e) would surrender to Hollister all Computing Assets upon termination of employment (§ IV.D.). A true and correct copy of Hollister's Global Acceptable Use of Computing Assets Policy is attached as **Exhibit D** and made a part hereof.

19.     Sugrue also agreed, pursuant to Hollister's Code of Conduct, that he must follow all company policies, procedures, and standards, use good judgment, and comply with all applicable laws and regulations to properly safeguard Hollister intellectual property.  (Code of Conduct, p. 19.)  True and correct copies of the two  Hollister's Code of Conduct Policies that

were in place over the relevant time period are attached as **Group Exhibit E** and made a part hereof.

20.     Sugrue also agreed, pursuant to the VSA, that he would comply with the 2022 Employment Agreement and the above-described Hollister policies and Code of Conduct. (VSA, pp. 1-4; § B.1.) A true and correct copy of the VSA is identified as **Exhibit F** and made a part hereof.  Exhibit F will be filed under seal for confidentiality reasons.

21.      Sugrue also agreed, pursuant to the VSA, that he would return all Hollister and Group Company property, including Proprietary Information, by March 31, 2023, or earlier if requested. (Ex. F., § B.3.)

22.     Sugrue also agreed, pursuant to the VSA, that by signing the VSA, Sugrue represented and warranted he had returned to Hollister all Hollister and other Group Company documents, property, and information (and all copies thereof) in his possession and control. (Ex. F., §§ B.3., 11.)

23.     Sugrue also agreed, pursuant to the VSA that if he used any personal electronic device to receive, transmit, store, etc. Hollister and other Group Company property, then he must within five (5) calendar days after his Separation Date of March 31, 2023: (a) provide Hollister with a copy of the information; and (b) cooperate with Hollister legal counsel regarding the deletion of the information from his personal systems; and (c) provide Hollister with access to his personal systems, as requested, to verify that the necessary copying and deletion is done.  (Ex. F., § B.3.)

24.     Sugrue's "timely compliance" with the provisions of § B.3. of the VSA is a "precondition of" his receipt of severance benefits otherwise due under the VSA.  (Ex. F., § B.3.)

25.     Sugrue agreed in the VSA that an actual or threatened breach of the above obligations to Hollister would cause irreparable damage to Hollister and, therefore, in the event of a violation of the VSA, in addition to other remedies that may be available, Sugrue consents and stipulates to the entry of injunctive relief prohibiting him from breaching or further breaching the VSA. (Ex.F., § D.1.)

<u>**Sugrue's Misappropriation of Trade Secrets and Other Misconduct**</u>

26.     Because of his high-level positions and long tenure with Hollister, Sugrue's knowledge of trade secrets and other confidential and highly sensitive information regarding the finances and operations of JDS, Hollister, and KMT was broad and deep. Hollister entrusted Sugrue with access to a multitude of competitive information regarding Hollister's manufacturing processes, customers, suppliers, and long- and short-term business strategies.

27.     Sugrue acknowledged in the 2022 Employment Agreement that during the entirety of his employment with Hollister he occupied strategic, sensitive, and far-reaching positions that exposed him to the proprietary information, inventions, and other intellectual property of JDS, Hollister, and KMT. (Ex. A, §§ 5.4, 12.1.)

28.     On February 1, 2023, Hollister informed Sugrue that his Vice President Manufacturing Strategy position was to be eliminated, and presented him with a draft VSA with a separation date of March 31, 2023.

29.     On the evening of February 2, 2023, Sugrue sent his supervisor, Amanda Robinson, an email stating he would not be coming to the office on February 3, 2023, because he was "upset and still shocked at the decision and need time to gather my thought [sic]."

30.     On February 8, 2023, Sugrue told JDS Chief Human Resource Officer Susan Nutson ("Nutson") that he would work for Hollister through February 2023 and take the entire

month of March as paid vacation. In other words, Sugrue would perform no work on behalf of Hollister after February 28, 2023.

31.     On the evening of February 12, 2023, Sugrue sent Nutson an email confirming he would work through February 2023 and take March as paid vacation.

32.     From approximately February 1, 2023 to March 8, 2023, Hollister and Sugrue, through Nutson, negotiated the terms of the VSA. On or about February 23, 2023, Nutson gave Sugrue a revised draft VSA. On March 9, 2023, Nutson informed Sugrue that Hollister would not make changes to the draft VSA given to him on February 23, 2023, and Sugrue informed Nutson he would sign the February 23, 2023 version of the VSA on his last date of employment - March 31, 2023. Sugrue eventually signed the February 23, 2023 version of the VSA.

33.     Every draft VSA that Hollister gave Sugrue contained the language in § B.3. of the VSA ultimately signed by Sugrue. That is, every draft required Sugrue to: (a) return to Hollister all Hollister and other Group Company property on his last date of employment; (b) provide Hollister with copies of all Hollister and other Group Company property Sugrue transferred to or stored on his personal electronic devices or systems; (c) cooperate with Hollister legal counsel regarding the deletion of the information from his personal systems; and (d) provide Hollister with access to his personal devices and systems, as requested, to verify that the necessary copying and deletion was done.

34.     Nutson and Sugrue met in Sugrue's office at Hollister's Libertyville facility on Thursday, March 9, 2023, for Sugrue's exit interview. Nutson and Sugrue discussed Sugrue's return of all Hollister property, including, without limitation, the Hollister-assigned security badge, keys, corporate credit card, parking pass, Lenovo laptop computer (the "Hollister Laptop"), and Hollister mobile devices capable of storing or transporting electronic data.

35.     During the March 9, 2023 exit interview, Sugrue told Nutson he had: downloaded Hollister property to personal mobile devices capable of storing or transporting electronic data (*e.g.*, flash drives, mobile phones, USB drives, external hard drives); printed Hollister property; and emailed Hollister property to his personal email account.  Sugrue also told Nutson he had deleted a number of files from Hollister's computing assets and that the deleted files were "mostly personal."  In response, Nutson told Sugrue he should not delete company documents and materials from any electronic device and that he must return all Hollister and other Group Company property, including his personal or externally-owned devices to which he transferred Hollister property, to Hollister on March 31, 2023.  Sugrue stated he would comply with Nutson's direction.

36.     Sugrue's facial response to Nutson's directive described in ¶ 35, above, caused Nutson to think Sugrue was not taking her directive seriously.  Nutson contacted Hollister's Law Department with her concern.  Hollister thereafter conducted an internal forensic audit of Sugrue's use of Hollister's computing assets.

37.     On March 23, 2023, Sugrue emailed Nutson stating he "forgot he had some personal files" on the U drive on Hollister's network.  Sugrue asked Nutson for help in retrieving those files, stating "these are old files I would like a copy and then delete them."

38.     On or about March 25, 2023, Hollister discovered through its internal forensic audit that Sugrue had exfiltrated large amounts of Hollister and other Group Company property from Hollister's computing assets on February 2, February 7, February 15, February 16, February 20, February 21, February 28, March 2, March 6, March 7, March 8, March 9, March 14, and March 16, 2023, including downloading the property to one or more external mobile devices, emailing the property to Sugrue's personal email address, and deleting property from Hollister's computing assets.

39.     On February 2, 2023, Sugrue accessed approximately two (2) emails with attachments from Hollister's secure network to which he had password-protected access and emailed them to his personal email account. On February 2, 2023, Sugrue also deleted approximately two files from Hollister's secure network.

40.     The files pulled on February 2, 2023 pertained to a company share ledger.

41.     On February 7, 2023, Sugrue accessed approximately 200 files from Hollister's secure network to which he had password-protected access and downloaded them to removable media. On February 7, 2023, Sugrue also deleted approximately 50 files from Hollister's secure network.

42.     The files pulled on February 7, 2023 pertained to strategy, manufacturing, company guidelines, financial documents, and documents relating to Board of Director meetings.

43.     The files deleted on February 7, 2023 pertained to manufacturing strategy, Hollister's Global Operations, and personal financial documents.

44.     On February 15, 2023, Sugrue accessed approximately 105 emails with attachments from Hollister's secure network to which he had password-protected access and emailed them to his personal email account. On February 15, 2023, Sugrue also deleted approximately 20 files from Hollister's secure network.

45.     The files pulled on February 15, 2023 pertained to annual operating plan proposals, company product information, and scans of documents whose contents cannot be determined.

46.     The files deleted on February 15, 2023 pertained to ongoing projects, company presentations, and competitor analysis.

47.     On February 16, 2023, Sugrue accessed approximately 249 files from Hollister's secure network to which he had password-protected access and downloaded them to removable

media. On February 16, 2023, Sugrue also deleted approximately 30 files from Hollister's secure network.

48.    The files pulled on February 16, 2023 pertained to company presentations, company strategy proposals, manufacturing, and competitor analysis.

49.    The files deleted on February 16, 2023 pertained to company presentations, and personal documents.

50.    On February 20, 2023, Sugrue accessed approximately 10 emails with attachments from Hollister's secure network to which he had password-protected access and emailed them to his personal email account. On February 20, 2023, Sugrue also deleted approximately 40 files from Hollister's secure network.

51.    The files pulled on February 20, 2023 pertained to strategy documents, personal documents, company presentations and scans of documents whose contents presently cannot be determined.

52.    The files deleted on February 20, 2023 pertained to company presentations, manufacturing strategy, and plant comparison data.

53.    On February 21, 2023, Sugrue accessed approximately 105 emails with attachments from Hollister's secure network to which he had password-protected access and emailed them to his personal email account.

54.    The files pulled on February 21, 2023 pertained to annual operating plan proposals and company presentations.

55.    On February 28, 2023, Sugrue accessed approximately 160 files from Hollister's secure network to which he had password-protected access and downloaded them to removable

media. On February 28, 2023, Sugrue also deleted approximately five (5) files from Hollister's secure network.

56.     The files pulled on February 28, 2023 pertained to annual operating plan proposals, company presentations, manufacturing strategy, and global operating strategy.

57.     The files deleted on February 28, 2023 pertained to global operating strategy and company presentations.

58.     On March 2, 2023, Sugrue accessed approximately 35 files from Hollister's secure network to which he had password-protected access and downloaded them to removable media. On March 2, 2023, Sugrue also deleted approximately 10 files from Hollister's secure network.

59.     The files pulled on March 2, 2023 pertained to annual operating plan proposals, company presentations, competitor analysis, and ongoing projects.

60.     On March 6, 2023, Sugrue accessed approximately 385 emails with attachments from Hollister's secure network to which he had password-protected access and sent them to his personal email account. On March 6, 2023, Sugrue also deleted approximately 10 files from Hollister's secure network.

61.     The files pulled on March 6, 2023 pertained to agreements, personal documents and scans of documents whose contents presently cannot be determined.

62.     On March 7, 2023, Sugrue accessed approximately 80 emails with attachments from Hollister's secure network to which he had password-protected access and sent them to his personal email account.  On March 7, 2023, Sugrue also accessed approximately 96 files from Hollister's secure network to which he had password-protected access and downloaded them to removable media. On March 7, 2023, Sugrue also deleted approximately 100 files from Hollister's secure network.

63.     The files pulled on March 7, 2023 pertained to manufacturing strategy, company presentations, and marketing strategy.

64.     The files deleted on March 7, 2023 pertained to Year-End Reports to the Board of Directors and personal documents.

65.     On March 8, 2023, Sugrue accessed approximately 189 files from Hollister's secure network to which he had password-protected access and downloaded them to removable media. On March 8, 2023, Sugrue also deleted 93 files from Hollister's secure network.

66.     The files pulled on March 8, 2023 pertained to Year-End Reports, Strategic Plans Communications, Board of Director presentations, and company presentations.

67.     The files deleted on March 8, 2023 pertained to Year-End Reports, Strategic Plans Communications, and Board of Director presentations.

68.     On March 9, 2023, Sugrue accessed approximately 12 emails with attachments from Hollister's secure network to which he had password-protected access and sent them to his personal email account.

69.     The files pulled on March 9, 2023 pertained to scans of documents whose contents presently cannot be determined.

70.     On March 14, 2023, Sugrue accessed approximately 16 emails with attachments from Hollister's secure network to which he had password-protected access and sent them to his personal email account. On March 14, 2023, Sugrue also deleted approximately 90 files from Hollister's secure network.

71.     The files pulled on March 14, 2023 pertained to scans of documents whose contents presently cannot be determined.

72.     The files deleted on March 14, 2023 pertained to scans of documents whose contents presently cannot be determined.

73.     On March 16, 2023, Sugrue accessed approximately eight (8) emails with attachments from Hollister's secure network to which he had password-protected access and sent them to his personal email account.

74.     The files pulled on March 16, 2023 pertained to information on how to factory reset an Apple product and scans of documents whose contents presently cannot be determined.

75.     The information Sugrue exfiltrated on the above dates included Hollister's and other Group Companies' trade secrets and other highly confidential information, including but not limited to, Hollister's key initiatives, strategic planning documents, Board of Director and Trustee presentations, global operations documents including operating plans, and plans and product drawings.

76.     Sugrue attempted to conceal his February 2, February 7, February 15, February 16, February 20, February 28, March 2, March 6, March 7, and March 8, March 14, 2023 wrongful conduct by deleting all of the OneDrive, Hollister's cloud storage and file sharing system, folders and files that had been transferred.

77.     Sugrue's downloading and transfer of Hollister and other Group Company information to his personal devices violated Hollister's Global Acceptable Use of Computing Assets Policy and the 2022 Employment Agreement.  Sugrue's conduct also was contrary to the VSA that Hollister gave him for review on February 1, 2023, and contrary to every subsequent draft of the VSA Hollister gave to Sugrue and the one he ultimately signed.

78.     Sugrue had no legitimate Hollister-related business reason for accessing and transferring Hollister files.  The materials he downloaded to personal devices and transferred to

his personal email account were accessible to him by means of the Hollister Laptop he had possession of until March 31, 2023. Further, Sugrue knew, as of February 1, 2023, that his employment would end on March 31, 2023. He planned on being on vacation all of March 2023 or nearly all of March 2023, making use of the materials he downloaded to personal devices and transferred to his personal email account unnecessary.

79. On Wednesday, March 29, 2023, at 7:30 a.m., Nutson conducted a telephone call with Sugrue in anticipation of his last date of employment on Friday, March 31, 2023. During the telephone call, Nutson confronted Sugrue with the results of Hollister's internal forensic audit of Hollister computing assets. Sugrue told Nutson he took the files because he thought he might need them as part of his negotiation with Hollister. Sugrue also told Nutson he since had deleted all of the materials. In response, Nutson reminded Sugrue several times of his obligations under the VSA, the 2022 Employment Agreement, and Hollister's computing asset policies, told him to return all Hollister and other Group Company property on March 31, 2023, and told him not to delete any Hollister and other Group Company property from his Hollister Laptop or his personal devices. Nutson and Sugrue agreed that Sugrue would arrive at Hollister's Libertyville facility at 10:00 a.m. on Friday, March 31, 2023, to turn over Hollister and other Group Company property and his personal devices for forensic testing ("the Turnover Meeting"). However, by email later in the morning of March 29, Sugrue asked Nutson if the Turnover Meeting could be delayed to 11:30 a.m. Nutson granted Sugrue's request.

80. In the afternoon of March 29, 2023, Nutson sent Sugrue an email reminding Sugrue that § B.3. of the VSA required him to provide Hollister with an electronic copy of any Hollister or Group Company property he had transferred to personal devices, to cooperate with Hollister legal counsel regarding the deletion of the information from his personal devices, and to provide

Hollister with access to his personal devices and systems to verify that Hollister had copies of all data Sugrue had exfiltrated and to effectuate the deletion of the data from Sugrue's systems and devices.

81.     At approximately 11:30 a.m. on March 31, 2023, Sugrue arrived at the Libertyville facility for the Turnover Meeting and met with Hollister employees Tom Horkan ("Horkan") and Howard Taylor ("Taylor").  Sugrue turned over the Hollister Laptop, an external hard drive Sugrue had plugged into the Hollister Laptop, three (3) USB drives, and a box containing paper copies of documents.   The box contained Sugrue's signed VSA dated March 31, 2023.

82.     During the Turnover Meeting, Sugrue told Horkan that Sugrue was concerned about turning over the Sugrue iMac and other personal devices without a "non-disclosure agreement."  Horkan and Sugrue agreed that Sugrue should call Nutson and address his concern with her.  Sugrue phoned Nutson while he was at the Libertyville facility on March 31. During the call, Nutson told Sugrue that Hollister would provide him with a consent agreement on Monday, April 3, 2023, at which time he would turn over to Hollister his personal electronic devices, including, without limitation, the Sugrue iMac.  During the phone call, Sugrue asked Nutson if he should get the Sugrue iMac "wiped."  Nutson told him he should not wipe the Sugrue iMac and that Hollister needed to do a forensic examination of the device.

83.     Sugrue did not turn over the Sugrue iMac to Hollister on Friday, March 31, 2023. Instead, on Friday, March 31, 2023, Sugrue caused the Sugrue iMac to be "wiped," that is, restored to factory settings by the Geek Squad (an assumed name for Best Buy Stores, L.P.) located in Vernon Hills, Illinois, not far from Hollister's Libertyville facility.  By wiping the Sugrue iMac, Sugrue erased and wrote over the contents and history of the hard drive of the Sugrue iMac.  In doing this, Sugrue wiped out files and metadata on the Sugrue iMac that would have allowed

Hollister to see or recover his activities on the Sugrue iMac – including what Sugrue did with any copied files from Hollister's computing network.

84.     Sugrue wiped the Sugrue iMac in direct contravention of Nutson's directive not to do so.

85.     Sugrue wiped the Sugrue iMac in violation of § B.3. of the VSA.

86.     Sugrue wiped the Sugrue iMac without informing Hollister he was intending to do so beforehand.

87.     On Friday, March 31, 2023, Hollister provided the Hollister Laptop and other electronic devices Sugrue delivered to Hollister at the Turnover Meeting to Hollister's forensic vendor.

88.     On Monday, April 3, 2023, Sugrue came to the Libertyville facility and met with Taylor.  Sugrue signed a Consent Agreement pertaining to Hollister's forensic review of the electronic devices at issue, and turned over the Sugrue iMac, his personal iPad, a USB drive (also known as a flash drive, thumb drive, and jump drive), and one smartphone.  Sugrue told Taylor he had wiped the Sugrue iMac and the USB drive.  Sugrue refused to turn over a second personal smartphone to Hollister.  To date, Sugrue has not turned over the second personal smartphone to Hollister.

89.     On April 3, 2023, Hollister provided the devices described in ¶ 88, above, to its forensic computer vendor.

90.     After incurring a great deal of time, money, and attorneys' fees in this matter, Hollister has discovered through the forensic reviews of Hollister's computing assets and Sugrue's electronic devices he turned over to Hollister that Sugrue exfiltrated Hollister and other Group Property trade secrets and other proprietary information from Hollister computing assets by

downloading information to personal and/or externally-owned devices and by emailing information from Hollister's computing assets to his personal email address. Furthermore, following such exfiltration, Sugrue deleted Hollister and other Group Company property from Hollister computing assets and Sugrue spoliated data to cover up his wrongdoing and transferred Hollister and other Group Company property to unauthorized persons, including the Geek Squad. Moreover, on March 16, 2023, Sugrue researched How to wipe your iPhone to Factory Fresh. On March 31, 2023, Sugrue caused the Sugrue iMac to be wiped and Sugrue caused Sugrue's USB drive to be factory wiped. Lastly, on April 3, 2023, Sugrue caused his Apple tablet and smartphone to be factory wiped; and, while employed by Hollister, Sugrue transferred Hollister electronic and other property to himself in anticipation of bringing litigation against Hollister and/or JDS in connection with the elimination of his Vice President Manufacturing Strategy position and termination of employment.

91. The full extent of Sugrue's transfer and disclosure of Hollister and other Group Company trade secrets and other proprietary information remains unclear due to Sugrue's spoliation of evidence. Moreover, Sugrue repeatedly has refused to provide Hollister with a representation and warranty that he has not provided Hollister and other Group Company trade secrets and other proprietary information to persons other than the Geek Squad. Sugrue's refusals to represent and warrant that he has not provided Hollister and other Group Company trade secrets and other proprietary information to persons other than the Geek Squad took place as recently as March 14, 2024.

92. On February 5, 2024, Sugrue filed a state court complaint in Lake County, Illinois against Hollister and JDS alleging Hollister and JDS wrongfully terminated his employment by

eliminating his position of Vice President Manufacturing Strategy and terminating his employment effective March 31, 2023 (the "Sugrue State Court Action").

93.     On information and belief, Sugrue exfiltrated Hollister and other Group Company property, as above-described, for unlawful purposes, including impermissible and sanctionable "self-help discovery" for purposes of bringing anticipated civil litigation against Hollister and/or JDS, including the Sugrue State Court Action.

94.     Sugrue breached his fiduciary duty to Hollister by: engaging in the above-described exfiltration; deleting Hollister and other Group Company property from Hollister computing assets; wiping Hollister and other Group Company property from his personal and/or externally-owned personal devices and systems; and spoliating evidence.

95.     Sugrue lacked authority to exfiltrate the above-described information, to possess the above-described information, or to give the above-described information to third parties, including, without limitation, the Geek Squad.

96.     As such, Hollister brings this matter to enjoin Sugrue from unfairly competing with Hollister in the future, from using or disclosing any of Hollister's or other Group Company's trade secrets and other proprietary information, and to compensate Hollister for the losses it has incurred due to Sugrue's brazen misappropriation of Hollister's and other Group Company's trade secrets and other proprietary information, and his multiple breaches of the VSA.

## COUNT I
### MISAPPROPRIATION OF TRADE SECRETS
### IN VIOLATION OF THE DEFEND TRADE SECRETS ACT, 18 U.S.C. §§ 1836, *ET SEQ.*

97.     Hollister hereby re-alleges and incorporates by reference the allegations of paragraphs 1 through 96 of the Complaint, inclusive, as though set forth in full.

98. During the entire course of his employment with Hollister, Sugrue had access to trade secrets and other nonpublic confidential information that is of extraordinary value to Hollister and other Group Companies.

99. As set forth above, Hollister expended significant amounts of time and money to develop, accumulate, maintain, refine, and possess certain: trade secrets for its health care products and services; strategic planning for key health care products and brands; strategic vision and direction of the JDS organization as a whole; financing and marketing decisions; financial information; challenges faced by Hollister products in both use and competition; and steps (and evaluation of those steps) Hollister has implemented and is considering implementing to address those challenges. This information constitutes "trade secrets" under the DTSA.

100. Hollister and Group Companies have made concerted efforts, and have taken reasonable measures, to maintain the secrecy of their trade secrets and to prevent the unauthorized disclosure or use of their trade secret information through, among other measures, requiring a keycard to access its physical sites and buildings; password-protecting and encrypting their computers, email accounts, and information systems; limiting access (electronically and physically) to sensitive information to those employees whose positions warrant them having such access; and clearly communicating to employees that Hollister and Group Company confidential information is to be kept confidential. Further, Hollister has a strict "clean desk" policy and guidelines on securing its highly sensitive competitive and confidential information in locked file cabinets, and management regularly performs reviews to ensure compliance with these policies. Sugrue was subject to these requirements.

101. Hollister and Group Company trade secrets derive independent economic value and confer a competitive edge to Hollister and Group Companies from not being generally known to,

and not being readily ascertainable by proper means by, other companies or individuals (in Hollister's and Group Companies' industry or elsewhere) that could obtain an advantage from them by virtue of their not being accessible, through proper means, to competitors who could profit from their use or disclosure. Hollister provided Sugrue access to Hollister and Group Company trade secret information for the limited purpose of his use of this information during the scope of his employment for Hollister.

102.    These trade secrets are used in interstate commerce by Hollister and Group Companies in their businesses within the United States and internationally.

103.    Sugrue misappropriated Hollister trade secret information by improper acquisition when he transferred the information to his personal email account and non-Hollister devices and systems in violation of the above-described Hollister policies, in violation of the 2022 Employment Agreement, and in contravention of the VSA.

104.    Sugrue misappropriated Hollister trade secret information by unauthorized disclosure when he provided the Sugrue iMac and USB devices to the Geek Squad.

105.    On information and belief, and as indicated by Sugrue's wiping of his personal devices and deletion of his use history and his refusal to represent and warrant to Hollister that he did not provide the information to anyone other than the Geek Squad, Sugrue misappropriated Hollister trade secret information by unauthorized disclosure of the information to third parties other than the Geek Squad.

106.    On information and belief, and as indicated by Sugrue's wiping of his personal devices and deletion of his use history and his refusal to represent and warrant to Hollister that he did not provide the information to anyone other than the Geek Squad, Sugrue misappropriated Hollister trade secret information by unauthorized use of the information by third parties.

107.    Sugrue's misappropriation of Hollister trade secrets has been willful and malicious in that he was aware of his contractual obligations to maintain the confidentiality of Hollister and Group Company trade secrets, yet he violated those obligations when he obtained and transferred the trade secrets to his personal accounts and devices and to the Geek Squad. As further evidence that his misappropriation was willful and malicious, Sugrue attempted to conceal his misappropriation of Hollister and Group Company trade secrets and other proprietary information by deleting data from Hollister's computing assets and from his personal electronic devices.

108.    Based on Sugrue's deletion of materials from Hollister's computing assets, his wiping of the Sugrue iMac and his other personal devices, and his refusal to warrant and represent to Hollister that he has not provided Hollister's trade secrets to anyone other than the Geek Squad, a negative inference can be made that Sugrue has used the misappropriated trade secrets.

109.    Sugrue's misconduct was not only a violation of the above-described Hollister policies and Code of Conduct, the 2022 Employment Agreement, the VSA, and common and statutory law, but also constitutes a willful and malicious misappropriation of Hollister trade secrets in violation of the DTSA.

110.    Unless enjoined by this Court, Sugrue's misappropriation of Hollister trade secrets will cause significant irreparable harm to Hollister, and Hollister has no adequate or other remedy at law for such acts and threatened acts. As such, Hollister is entitled to injunctive relief.

111.    As a direct, proximate, and foreseeable result of Sugrue's misappropriation of Hollister trade secrets, Hollister has also been monetarily damaged in an amount to be determined at trial.

WHEREFORE, Hollister respectfully requests that the Court enter an Order granting judgment in favor of Hollister and against Sugrue on Count I and ordering the following relief:

a. The issuance of preliminary and permanent injunctive relief enjoining Sugrue from directly or indirectly misappropriating, disclosing, or using Hollister's confidential information and trade secrets;

b. The issuance of a mandatory injunction compelling Sugrue to return all documents and other materials containing or constituting Hollister's confidential information and trade secrets;

c. The award of compensatory damages in an amount to be determined pursuant to 18 U.S.C. § 1030(g); and

d. Such other relief as the Court deems just and proper.

## COUNT II
### MISAPPROPRIATION OF TRADE SECRETS
### IN VIOLATION OF THE ILLINOIS TRADE SECRETS ACT, 765 ILCS 1065/1, *ET SEQ.*

112.    Hollister repeats and incorporates by reference the allegations of paragraphs 1 through 96 of the Complaint, inclusive, as though set forth in full.

113.    At all relevant times, there was in effect an Illinois statute, 765 ILCS 1065/1, *et seq.*, known as the Illinois Trade Secrets Act ("ITSA").

114.    Hollister owned and developed trade secrets as defined by 765 ILCS 1065/2(d).

115.    Hollister's confidential information described above constitutes trade secrets because Hollister derives independent economic value and a competitive edge from that information not being generally known to the public and not being readily ascertainable by proper means by other persons who can obtain economic value from its disclosure or use, and because the information was the subject of reasonable efforts to maintain its secrecy.

116.    Hollister invested substantial time, money, and effort to develop, accumulate, maintain, and refine its trade secret information. Hollister has made concerted efforts and taken reasonable steps to maintain the secrecy of its trade secrets and to prevent the unauthorized disclosure or use of its trade secret information. As described in greater detail above, Hollister, among other things, maintains its trade secret information on password-protected computers,

limits access to the information, mandates that employees follow its confidentiality policies, and requires employees to sign employee agreements containing confidentiality provisions.

117. Pursuant to 765 ILCS 1065/2, a person who misappropriates the trade secret of another person by improper means or discloses the trade secret without the express or implied consent of the person or who used improper means to acquire the knowledge of the trade secret violates the ITSA.

118. The above-alleged facts constitute misappropriation and threatened misappropriation of trade secrets pursuant to the ITSA.

119. Sugrue's knowledge of Hollister and other Group Company trade secret information was acquired under circumstances giving rise to a duty to maintain the information's secrecy and limit its use, which duty Sugrue owed Hollister both contractually and as an employee of Hollister.

120. Sugrue made improper use of Hollister's trade secret information when he improperly downloaded Hollister's proprietary materials onto his personal devices and transferred the materials to his personal email account.

121. Sugrue's misappropriation of Hollister's trade secrets has been willful and malicious in that he was aware of his contractual obligations to maintain the confidentiality of Hollister's trade secrets, yet he violated those obligations when he obtained and transferred the trade secrets to his personal accounts and devices and to the Geek Squad. As further evidence that his misappropriation was willful and malicious, Sugrue attempted to conceal his misappropriation of Hollister and Group Company trade secrets and other proprietary information by deleting data from Hollister's computing assets and from his personal electronic devices.

122. The above-alleged facts constitute misappropriation and threatened misappropriation of trade secrets by Sugrue pursuant to the ITSA.

123. Sugrue's misappropriation of Hollister's trade secrets has been willful and malicious in that he was aware of his contractual and policy obligations to maintain the confidentiality of Hollister's trade secrets, yet he violated those obligations when he obtained and transferred them to his personal accounts and devices and gave them to the Geek Squad. As further evidence that his misappropriation was willful and malicious, Sugrue attempted to conceal his misappropriation by deleting the OneDrive folders and files that he stole to avoid detection by Hollister, and he lied about the scope of his misappropriation when initially questioned by Hollister.

124. Sugrue will be unjustly enriched by the misappropriation of Hollister's trade secrets, and unless restrained, will continue to use, divulge, and otherwise misappropriate Hollister's trade secrets.

125. Hollister has been injured, irreparably and otherwise, and is threatened with additional and ongoing injuries as a result of Sugrue's misappropriation of trade secrets.

126. Sugrue has used or disclosed and may continue to use or disclose Hollister's trade secrets and confidential and proprietary information, in violation of Illinois law and his duties to Hollister. This disclosure and use have and will continue to wrongfully benefit Sugrue to the detriment of Hollister. Sugrue's unauthorized, wrongful, and tortious conduct has directly and proximately caused great and irreparable injury to Hollister which cannot be adequately measured or compensated by money damages.

127. Hollister has no adequate remedy at law and is entitled to equitable and injunctive relief.

128.    Hollister has suffered damages as a result of these actions in an amount to be determined at trial, and because its remedy at law is inadequate, Hollister seeks injunctive relief to protect its trade secret information, its goodwill and other legitimate business interests. Hollister also seeks to recover from Sugrue any gains, profits and advantages obtained as a result of the wrongful acts alleged herein in an amount to be determined and an award of exemplary damages and attorneys' fees as permitted by law.

WHEREFORE, Hollister respectfully requests that the Court enter an Order granting judgment in favor of Hollister and against Sugrue on Count II and ordering the following relief:

a.  The issuance of preliminary and permanent injunctive relief enjoining Sugrue from directly or indirectly misappropriating, disclosing, or using Hollister's confidential information and trade secrets;

b.  The issuance of a mandatory injunction compelling Sugrue to return all documents and other materials containing or constituting Hollister's confidential information and trade secrets;

c.  The award of compensatory damages in an amount to be determined at trial;

d.  The award of exemplary damages of twice the amount of compensatory damages due to Sugrue's "willful and malicious misappropriation," as provided by 765 ILCS 1065/4(b).

e.  Such other relief as the Court deems just and proper.

### COUNT III
### VIOLATION OF THE COMPUTER FRAUD AND ABUSE ACT, 18 U.S.C. §1030

129.    Hollister realleges and incorporates by reference the allegations of Paragraphs 1 through 96 of the Complaint, inclusive, as though set forth in full.

130.    Sugrue's Hollister-issued computing devices, including, without limitation, the Hollister Laptop, each were used in interstate commerce and they each constitute a "Protected Computer" under the Computer Fraud and Abuse Act.

131.    Without authorization, or by exceeding authorized access, Sugrue intentionally accessed his Hollister-issued computing devices with the intent to defraud Hollister in violation of §§ 1030(a)(2)(c), (a)(4), and (a)(5) of the CFAA, including by: (a) obtaining certain information from the Hollister-issued computing devices and/or the Hollister computing network; (b) obtaining copies of certain documents and files of value from the Hollister-issued computing devices and/or the Hollister computing network; and (c) deleting electronic files from the Hollister-issued computing devices and/or the Hollister computing network

132.    By engaging in the above-described misconduct for the purpose of misappropriating Hollister's confidential information and trade secrets, Sugrue breached his fiduciary duties and other obligations owed to Hollister.  Sugrue had no authority or authorization for the above-described misconduct.

133.    Sugrue intentionally and recklessly caused damage and loss to Hollister in excess of $5,000.00 within a 12-month period because his conduct impaired the integrity of Hollister's protected computer and required Hollister to investigate the above-described misconduct, conduct forensic examinations of the Hollister-issued devices and the Sugrue devices to ascertain the scope of Sugrue's misconduct, and perform certain remedial measures required as a result of the above-described misconduct.

134.    As a further direct and proximate cause of the above-described misconduct, Hollister has been damaged and has suffered loss in an amount in excess of $5,000.00 in a 12-month period to the extent Sugrue accessed, deleted, destroyed, and copied electronic files containing Hollister trade secret and confidential information for his personal use and/or that of third parties.

WHEREFORE, Hollister respectfully requests that the Court enter an Order granting judgment in favor of Hollister and against Sugrue on Count III and ordering the following relief:

a. The issuance of preliminary and permanent injunctive relief enjoining Sugrue from directly or indirectly misappropriating, disclosing, or using Hollister's confidential information and trade secrets;

b. The issuance of a mandatory injunction compelling Sugrue to return all documents and other materials containing or constituting Hollister's confidential information and trade secrets;

c. The award of compensatory damages in an amount to be determined pursuant to 18 U.S.C. § 1030(g); and

d. Such other relief as the Court deems just and proper.

## **JURY DEMAND**

Hollister demands a trial by jury on all issues and causes of action so triable.

Dated:  July 3, 2024

Respectfully submitted,

HOLLISTER INCORPORATED

*/s/ Margherita M. Albarello*
Margherita M. Albarello
One of its attorneys

Margherita M. Albarello, Esq. (#6187375)
Christopher R. Parker, Esq. (#6270398)
GOLAN CHRISTIE TAGLIA LLP
70 W. Madison Street, Suite 1500
Chicago, Illinois 60602
(T): 312-263-2300
mmalbarello@gct.law
crparker@gct.law

## CERTIFICATE OF SERVICE

I, Margherita M. Albarello, an attorney, hereby certifies that on July 3, 2024, the foregoing **Complaint** was filed through the Court's ECF system.

By: */s/ Margherita M. Albarello*